UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------- X

WILLIAM CONSTANT            :

                          :     16-CV-3985 (PMH)

               Plaintiff,     :

                          :     **DEFENDANTS' STATEMENT**

   -against-              :     **OF MATERIAL FACTS**

                          :     **PURSUANT TO FED. R. CIV. P.**

N. DAPCEVIC, et al.,         :     **56 AND LOCAL RULE 56.1 WITH**

                          :     **PLAINTIFF'S AMENDED RESPONSE,**

           Defendants.    :     **AND PLAINTIFF'S ADDITIONAL**

----------------------------------------------X     **MATERIAL FACTS WITH**

                                              **DEFENDANTS' RESPONSE**

**DEFENDANTS' STATEMENT OF MATERIAL FACTS WITH PLAINTIFF'S
RESPONSE**

Pursuant to Rule 56.1 of the Local Rules of this Court, Defendants Correction Officer ("CO" or "Officer") Nedzad Dapcevic ("Dapcevic"), CO Antonio Alban ("Alban"), CO Brian Sturtevent ("Sturtevent"), CO Jonathan Markwick ("Markwick"), CO Bryan Hess ("Hess"), CO Michael Vennero ("Vennero"), and Sergeant ("Sgt.") Ronald Cabral ("Cabral") (collectively, "Defendants"), by their attorney LETITIA JAMES, Attorney General of the State of New York, submit the following statement of material facts as to which they contend there is no genuine issue in dispute and which entitle them to summary judgment as a matter of law, to which Plaintiff William Constant, by and through his attorneys, SOKOLOFF STERN LLP, respond:

1.    Plaintiff William Constant ("Plaintiff") was an inmate incarcerated by the New York State Department of Corrections and Community Supervision ("DOCCS") at Green Haven Correctional Facility ("Green Haven") on May 27, 2013. (See generally DOCCS Inmate Information (attached to the Declaration of Deanna L. Collins ("Collins Decl.") at Ex. A) (identifying dates Plaintiff was received and released from DOCCS' custody); Unusual Incident

Report (attached to Collins Decl. at Ex. B) at 1 (DEFENDANTS 0001) (identifying Plaintiff's facility on May 27, 2013).)

**Response:**     Undisputed.

2.     During the evening of May 27, 2013, while it was still daylight, Plaintiff was in the E&F Yard sitting at a table and playing cards with another inmate. (Pl.'s Dep. Tr. at 34:16—35:5, 68:20—69:5 (attached to Collins Decl. at Ex. C).)

**Response:**     Undisputed

3.     E&F Yard is large, approximately 100 yards by 100 yards, or the size of two and one-half to three basketball courts. It has several features, including weight benches, a basketball court, showers, tables, televisions, and phones. (See Decl. of Antonio Alban ("Alban Decl.") ¶ 6; Decl. of Ron Cabral ("Cabral Decl.") ¶ 6; Decl. of Nedzad Dapcevic ("Dapcevic Decl.") ¶ 6; Decl. of Bryan Hess ("Hess Decl.") ¶ 5; Decl. of Brian Sturtevent ("Sturtevent Decl.") ¶ 6; Decl. of Michael Vennero ("Vennero Decl.") ¶ 5; Pl.'s Dep. Tr. 65:2-7; see also Cabral Decl. ¶ 6 & Ex. A (Google Maps satellite image of the facility and indicating where the E&F Yard is located with a red circle in order to show the size of the Yard relative to familiar objects, such as vehicles that can be seen parked outside in the parking lot).)

**Response:**     Disputed. The cited evidence does not support that the E&F Yard is the "size of two and one-half to three basketball courts," and the portion of Plaintiff's deposition testimony cited fails to support any alleged fact set forth in paragraph 3. Plaintiff testified only that, *in his estimation,* two and a half to three basketball courts may fit *lengthwise* into the E&F Yard. (Pl. Dep. Tran. 64:2-13.) He also testified he has no idea the size of a basketball court. (*Id.* at 64:8-13.) Furthermore, the E&F Yard is approximately 110 yards by 110 yards. (Hess Dep. Tran at 56:9-16.) In any event, the alleged facts are not material to Defendants' motion for summary judgment against Plaintiff.

2

4.      The table at which Plaintiff was sitting was located in the far corner of the Yard, diagonal from the F&G Corridor door. (See Pl.'s Dep. Tr. 41:19—47:3;  59:2-5;  Pl.'s Dep. at Defs.' Ex. A (attached to Collins  Decl. at Ex. D), at p. 2 (Diagram of E&F Yard depicting as a red "X" in the upper right hand corner of the document near the word "Bathroom" the area where Plaintiff was sitting at a table playing cards).)

**Response:**      Disputed. The cited evidence does not support that Plaintiff was sitting diagonally from the F&G Corridor door, as it does not provide the location of the F&G Corridor door. Plaintiff was sitting at a table in the E&F Yard, near the red "X" depicted in the right-hand upper corner of the document at page 2 of Defendant's Exhibit A to Plaintiff's Deposition. (See Pl. Dep. Tran. at 42:2-47:2, Defs.' Ex. A. It is of note, the cited drawing is only a portion of the E&F Yard, not the whole thing. (Id. at 43:24-44:4.)

5.      During this same time, Officers Dapcevic, Alban, and Sturtevent were working in the E&F Yard supervising the inmates. (Alban Decl. ¶ 4; Cabral Decl. ¶ 5; Dapcevic Decl. ¶ 4; Sturtevent Decl. ¶ 4.) There are generally only three officers physically inside the E&F Yard during recreation periods.  (Alban  Decl.  ¶ 5;  Cabral  Decl.  ¶ 5;  Dapcevic  Decl.  ¶ 5;  Hess  Decl.  ¶ 4; Sturtevent Decl. ¶ 5; Vennero Decl. ¶ 4.) An officer-in-training may also have been briefly inside the Yard at the beginning  of the recreation period for a tour when the inmates were entering the Yard. (Alban Decl. ¶ 5; Dapcevic Decl. ¶ 5; Sturtevent Decl. ¶ 5.) However, this officer left before the incident at issue and no other officers were in the yard until a response was called and officers from other areas of the facility  arrived to assist in quelling  the fight between Plaintiff and inmate William  Reyes ("Reyes"). (Alban Decl. ¶ 5; Dapcevic Decl. ¶ 5; Sturtevent Decl. ¶ 5; see Decl. of Jonathan Markwick ("Markwick Decl.") ¶¶ 4-5 (describing response of officers).)

**Response:**      Disputed. While  it is undisputed that Officers Dapcevic, Alban, and Sturtevant were present and working in the E&F Yard during the May 27, 2013 incident, it is disputed that they were

supervising the inmates (*see* WC00001-03; Pl. Dep. Tran. at 33:6-34:7, 47:4-19, 123:24-124:12.) While the number of officers *generally* physically present in the E&F Yard during recreation periods is not a fact material to Defendants motion, it is a fact in dispute, as Defendants and their agents have asserted different accounts. (Burnett Dep. Tran. at 44:12-45:5; Vennero Dep. Tran. at 32:19-21, 38:4-8.) Additionally, and more materially, it is disputed that there were only three officers in the E&F Yard during the incident giving rise to Plaintiff's claims. (Pl. Tran. at 71:6-9; W00403-404 at 221:10-222:13; Vennero Dep. Tran. at 32:7-21, 38:4-8.) Lastly, Defendants' own cited evidence dispute whether there was one officer in training or more than one, present in the yard, (*see* Alban Decl. ¶ 5; Dapcevic Decl. ¶ 5; Sturtevant Decl. ¶ 5). And, there is dispute concerning whether one officer in training in particular, Officer Gomez, was still present during the incident at issue; documentary evidence suggests Officer Gomez worked the 3:00 pm to 11:00 pm shift in the E&F Yard *and* the Defendant officers have asserted both that they do not recall whether he was present and that he was no longer present. (DEFENDANTS 2322; Dapcevic Dep. Tran. at 60:8-61:8; Dapcevic Decl. ¶ 5; Alban Decl. ¶ 5; Sturtevant Decl. ¶ 5.)

6. The Yard Officers are responsible for ensuring the safety and security of all inmates as well as each other in the Yard. They patrol the Yard in teams to look for suspicious activity throughout the recreation period. Such suspicious activity may include, inter alia, drug use, contraband, weapons, violence among inmates, and violence against staff. (Alban Decl. ¶ 7; Cabral Decl. ¶ 7; Dapcevic Decl. ¶ 7; Sturtevent Decl. ¶ 7; Deputy Superintendent of Security Edward Burnett Dep. Tr. 45:10-17, 46:14-19 (attached to Collins Decl. at Ex. E).) During their patrol rounds, Yard Officers will frequently stop to observe the different scenarios that are occurring. For example, in areas where a large number of inmates gather, the officers will stop to observe that activity. These observations can take anywhere from a few seconds to several minutes or more, depending on the situation. (Dapcevic Decl. ¶ 7.) Yard Officers are also responsible for supervising the 7:00 pm medication run, where inmates in the Yard leave the Yard via the door that leads into

the F&G Corridor so that they can be escorted (by an Escort Officer) to go to the clinic and get their medications. Although this medication run is colloquially referred to as 7:00, it does not have a specifically fixed time. When this medication run is ready to go, an announcement is made over speakers in the Yard for inmates who are on this run to line up at the F&G Corridor Door. As inmates are lining up and waiting to be escorted out of the Yard, Yard Officers are positioned near the F&G Corridor Door. (Alban Decl. ¶ 8; Sturtevent Decl. ¶ 8; see also Burnett Dep. Tr. 45:18—46:13.)

**Response:**     Disputed. It is undisputed that officers assigned to the Yard are responsible for ensuring the safety and security of all inmates and one another. However, to the extent Defendants intend this general statement about what Yard Officers typically do to be informative about what occurred on May 27, 2013 in the E&F Yard, it is disputed that the Yard Officers patrolled the Yard to look for suspicious activity, including drug use, contraband, weapons, or violence among inmates; instead they remained near a door in the Yard, speaking with one another. (Pl. Dep. Tran. at 123:5-23; Dapcevic Dep. Tran. at 71:3-18.) Additionally, it is typical for one Yard officer to remain stationed outside of a shack near the concrete walkway halfway between the F&G Corridor Door and the E-Block Yard Door, or near the communication post near the door. (Sturtevant Dep. Tran. at 21:12-24:14.; Burnett Dep. Tran. at 45:18-46:13; Pl. Dep. Tran. at 123:5-23, 165:14-166:7.) More often than not, there is also one officer stationed in the watch chair near where Plaintiff was initially attacked. (Pl.'s Dep. Tran. at 46:17-47:15, 123:5-23, 165:14-166:7, Def's Ex. A.) On May 27, 2013, no officers were stationed at any of the aforementioned stations. (Pl. Dep. Tran. at 123:5-23; Dapcevic Dep. Tran. at 71:3-18.) The alleged facts regarding the amount of time observations can take or the 7:00 medication run are not material to Defendants' motion for summary judgment against Plaintiff.

7.     There are also only two officers assigned to the roof posts during recreation periods. On May 27, 2013, Officers Hess and Vennero were stationed on the East Roof, which overlooks

both the E&F and F&G recreation yards. (Cabral Decl ¶ 5; Hess Decl. ¶ 4; Vennero Decl. ¶ 4; <u>see</u> Alban Decl. ¶ 5; Dapcevic Decl. ¶ 5; Sturtevent Decl. ¶ 5.)  At the time of the incident, as part of their assigned duties as Roof Officers, Officer Hess carried a firearm, specifically a rifle, and Officer Vennero carried a gas gun used for firing CS gas canisters (commonly known as tear gas). (Hess Decl. ¶ 7; Vennero Decl. ¶ 7.)

**Response:**      Disputed. Although it is undisputed that Officers Hess and Vennero were stationed on the East Roof on May 27, 2013 and they were equipped with a rifle and gas gun, respectively, the cited evidence does not support that only two officers are assigned to the roof posts during recreation periods or that Officers Hess's and Vennero's position on the East Roof overlooked the F&G recreation yard. The latter alleged fact is also not material to Defendants' motion for summary judgment. Additionally the number of officers assigned to the roof during recreation posts is in dispute, as Defendant's expert regarding "DOCCS' policies and procedures, and officer training, with respect to the use of physical force, contraband, and the supervision of inmates in the yard," testified there is only one Roof Officer. (Defs.' Supplemental R. 26 Disclosures at p. 5; Burnett Dep. Tran. at 44:12-45:5.)

8.      The Roof Officers' duties included overlooking both the E&F and F&G Yards and ensuring the safety of the inmates and officers therein. They are equipped with firearms for this purpose. During the course of a recreation period, the Roof Officers constantly monitor both yards for signs of suspicious activity and violence. The roof upon which they are stationed is approximately 40 feet high, or three stories high. (Hess Decl. ¶¶ 4-5; Vennero Decl. ¶¶ 4-5.)

**Response:**      Disputed. The cited evidence does not support that Roof Officer's duties include overlooking the F&G Yard. (*see* Hess Decl. ¶¶ 4-5; Vennero Decl. ¶¶ 4-5.) Although it is undisputed the Roof Officers duties included overlooking the E&F Yard and ensuring inmate and officer safety, they did not overlook the F&G Yard, they overlooked the G&H Yard. (Vennero Dep. Tran. at 24:25-

25:5; Hess Dep. Tran. at 11:13-17.). In any event, the second yard the Roof Officers overlooked is not a fact material to Defendants' motion for summary judgment against Plaintiff.

9. The Roof Officers are authorized to use force, up to and including deadly force, when justified and necessary, by firing their weapons when they reasonably believe such force is necessary to protect the lives of individuals inside the Yard. The Roof Officers are also equipped to drop CS gas, which would be done when there is a riot or similar large-scale event occurring. The consequences of dropping gas include temporary blinding of individuals in the Yard, including officers and inmates, which can be extremely dangerous to those in the Yard because they cannot see to defend themselves. (Hess Decl. ¶ 6; Vennero Decl. ¶ 6.)

**Response:** The alleged facts raise an issue of law for the Court to decide and are only material to Defendants' motion for summary judgment against Plaintiff to the extent the implication is that the Roof Officers did not fire their weapons because they did not reasonably believe deadly force was necessary to protect the lives of any individuals inside the Yard. (*See* Hess Decl. at ¶ 11; Vennero Decl. at 12.)

10. There were approximately 300 inmates inside the E&F Yard during the May 27, 2013 evening recreation period. (Alban Decl. ¶ 6; Cabral Decl. ¶ 6; Dapcevic Decl. ¶ 6; Hess Decl. ¶ 5; Sturtevent Decl. ¶ 6; Vennero Decl. ¶ 5; see also Pl.'s Dep. Tr. 102:4-9 (testifying there were approximately 400-600 inmates in the Yard at that time).)

**Response:** Disputed. Defendant's alleged facts, and the citations included therein, demonstrate a dispute. "Approximately 300" is in dispute with "approximately 400-600."

11. While Plaintiff was sitting at a table in the corner of the Yard diagonal from the F&G Corridor Door playing cards, another inmate came up from behind him and cut him in the face, head, and ear with a knife or razor-like object. This incident lasted for approximately one second until Plaintiff spun out of the inmate's grasp and fell to the ground. He then stood up and

picked up a rock from the ground.  (See Pl.'s Dep. Tr. 34:16—37:6, 41:19—47:3;  59:2-15,  59:24—60:3, 61:25—62:13;  Pl.'s Dep. Tr. at Defs.' Ex. A, at p. 2 (depicting  as a red "X" in the upper right hand corner of the document near the word "Bathroom" the area where Plaintiff was sitting playing cards when he was cut); see also Alban Decl. ¶ 10; Dapcevic Decl. ¶ 8; Sturtevent Decl. ¶ 10.)

**Response:**      Disputed. The cited evidence does not support that Plaintiff was cut in the ear. Plaintiff was cut in the forehead, face/cheek, and right ear. (Pl. Dep. Tran. at 62:4-6; 100:2-3.) The remaining alleged facts are undisputed.

12.      Defendants did not observe Plaintiff getting slashed by the other inmate and had no prior awareness that this assault would have occurred. (Alban Decl. ¶¶ 10, 15; Cabral Decl. ¶ 9; Dapcevic Decl. ¶¶ 8, 14; Hess Decl. ¶¶ 10-11; Markwick Decl. ¶ 6; Sturtevent Decl. ¶¶ 10, 15; Vennero Decl. ¶¶ 11-12; Pl.'s Dep. Tr. 123:24—124:12.)

**Response:**      Disputed. Plaintiff's testimony cited in paragraph 12 does nothing to support the alleged facts. Furthermore, Defendants knew or should have known Plaintiff and/or other inmates were at risk of being slashed or otherwise injured with a weapon in the E&F Yard because it was not an uncommon occurrence there. (Markwick Dep. Tran. at 18:6-19:5; Sturtevant Dep. Tran. 38:7-21.)

13.      The rock that Plaintiff picked up measured approximately 3 inches x 4 inches. (Alban Decl. ¶ 14 & Ex. A (photographs of the rock).)

**Response:**      Undisputed. Defendants did not provide Exhibit A to Alban's Decl.

14.      Plaintiff saw Reyes when he stood up. He approached him and Reyes backed away. Plaintiff pursued Reyes around the Yard until they ended up near where Officers Dapcevic, Alban, and Sturtevent were standing near the F&G Corridor door. Plaintiff continued to carry the rock in his hand. (See Pl.'s Dep. Tr. 34:16—37:6, 59:16-23, 60:4-24, 62:14—68:5, 69:6—70:16, 70:22—73:13; Alban Decl. ¶¶ 9-10; Dapcevic Decl. ¶¶ 8-9; Hess Decl. ¶¶ 7-8; Sturtevent Decl. ¶¶ 10-11; Vennero Decl. ¶¶ 7-8.)

**Response:**      Disputed. Plaintiff did see Reyes when he stood up and began walking in his direction, however, Reyes was not simply backing away, instead he attempted to strike Plaintiff a number of times as they traveled the Yard. (Pl. Dep. Tran. at 34:16-37:6, 62:14-68:5; Gwin. Dep. Tran. at 11:4-13:4, 22:11-23:13). Also, when Plaintiff and inmate Reyes approached the officers, it was more than Officers Dapcevic, Alban, and Sturtevant standing near the corridor door; there were six or seven officers standing there. (Pl. Dep. Tran at 69:6-71:9.) It is undisputed Plaintiff had a rock in his hand.

15.      Officers Dapcevic, Alban, and Sturtevent noticed Plaintiff approaching them when he was approximately 10-70 feet away. They noticed he was bleeding and carrying something in his hand but they did not know what it was at that point, and they walked toward him. (See Pl.'s Dep. Tr. 71:25—75:16; Alban Decl. ¶¶ 10-11; Dapcevic Decl. ¶¶ 8-9; Sturtevent Decl. ¶¶ 10-11; see Vennero Decl. ¶ 9.)

**Response:**      Disputed. The large range between 10 feet and 70 feet certainly creates a dispute as to when the Officers noticed Plaintiff, especially because the three officers were standing together, and Officer Alban claims to have seen Plaintiff first and immediately notified Officer Sturtevant before the three officers ran, not walked, toward Plaintiff. (Alban Dep. Tran. at 21:5-15, 22:2-17, 24:11-26:11; Alban Decl. at ¶ 11; Sturtevant Dep. Tran. at 26:25-28:4.) Additionally, Officer Sturtevant testified when he noticed Plaintiff, he was standing still and bleeding, not approaching the officers. (DEFENDANTS 0016, marked Pl.'s Ex. 12; Sturtevant Dep. Tran. at 29:15-30:21; 67:10-68:1.) It is further disputed that the officers knew, at this point in time, Plaintiff had something in his hand because his hands were down at his sides. (Sturtevant Dep. Tran. at 30:5-31:3.)

16.      One of the officers called on his radio for other officers to respond to the Yard. (Alban Decl. ¶ 14; Cabral Decl. ¶ 8; Dapcevic Decl. ¶ 13; Hess Decl. ¶ 9; Markwick Decl. ¶ 5; Sturtevent Decl. ¶ 10.)

**Response:**      Undisputed.

9

17.     Officers Hess and Vennero first noticed Plaintiff while he was pursuing Reyes around the Yard because of the suspicious nature of their movements. Officers Hess and Vennero continued to monitor the inmates with their weapons ready but they did not fire them. These Officers did not and could not leave their post on the roof. (Hess Decl. ¶¶ 7, 11; Vennero Decl. ¶¶ 7, 12.)

**Response:**     Disputed. Both Officers Hess and Vennero claim responsibility for placing the other on notice of the situation unfolding; arguably one of the officers did not notice Plaintiff because of the "suspicious nature" of he and inmate Reyes' movements but because his partner told him. (Hess Decl. ¶ 7; Vennero Decl. ¶ 7.) Additionally, it is disputed that neither of the Officers could leave the roof, since only one officer is assigned there. (Burnett Dep. Tran. at 44:12-45:5.) Furthermore, a material fact Defendants omit regarding Officers Hess' and Vennero's actions on the East Roof is their failure to operate the camera. Neither of the Roof Officers turned on the camera, (Pl. Dep. Tran at 83:2-13; 163:6-164:15; Hess Dep. Tran. at 46:3-7; WC00485 at 303:16-24,) although they turn the camera on in "almost every situation." (Vennero Dep. Tran. 47:21-48:8.) Also, the May 27, 2013 incident "could be" a situation in which, based on officer training, the camera would generally be turned on. (Vennero Dep. Tran. at 48:18-49:16.) There was no reason Officer Vennero would not have turned the camera on during the incident involving Plaintiff and he had been instructed that the camera should be turned on if he observes a physical altercation between inmates. *Id.* Officer Hess is not sure why he did not turn on the camera but testified that if he sees something about to happen, he might turn the camera on. (Hess Dep. Tran at 29:22-25, 46:15-22.) All the Roof Officers had to do to record the incident was turn the camera on, direct it towards the incident, press a button to record, and possibly zoom in or out. (Vennero Dep. Tran. at 49:22-50:12; Hess Dep. Tran. at 27:9-22.)

18.     One or more officers in the Yard gave Plaintiff several direct orders to drop the object in his hand but Plaintiff did not do so, and Plaintiff did not speak to the officers to tell them

what had happened. There were several other inmates in the area near Plaintiff. (See Alban Decl. ¶¶ 11-12; Dapcevic Decl. ¶ 10; Sturtevent Decl. ¶¶ 11-12; Pl.'s Dep. Tr. 65:11—66:10, 102:17—103:23.)

**Response:**     Disputed. No direct orders were given to Plaintiff at this point. (WC00001-3; Dapcevic Dep. Tran. at 76:25-78:23;  Gwin Dep. Tran. at 11:8-13:4;  13:16-15:19;  22:11-24:4;  25:12-26:4.) Additionally, Plaintiff was bleeding profusely and screaming, "Look at what he did to me!" over and over, while moving toward the officers, clearly showing, and advising them he had been injured. (Alban Dep. Tran at 23:2-24:10; 41:25-43:11; Alban Decl. at ¶ 10.) It is also material and undisputed that whether or not Plaintiff explicitly said what happened to him, at least one officer present immediately believed Plaintiff was running after an inmate that was involved in the altercation leading to his state. (Sturtevant Dep. Tran. at 46:24-47:3.)

19.     Plaintiff testified at his deposition that after he was cut with the razor-like object, he was in a "fight for [his] life." He testified that when he approached the officers, the officers "semi" surrounded him, but Reyes then grabbed Officer Alban by Officer Alban's shoulders and stood behind Officer Alban such that Officer Alban was in between Reyes and Plaintiff. Plaintiff testified that Reyes held onto Officer Alban with both of his hands on Alban's shoulders and "thr[ew] him around like a rag doll." He testified that a few seconds later, another officer then grabbed Officer Alban away from Reyes' grasp and the officers backed away, which allowed the inmates to contact each other and physically fight, which they did. Plaintiff testified he still had the rock in his hand at this time and Reyes was holding the weapon used to cut Plaintiff earlier. (See Pl.'s Dep. Tr. 34:22—37:6;  75:25—85:11.)

**Response:**     Undisputed. It is also material and undisputed that other evidence in the record supports Plaintiff's testimony. Another inmate, Davon Gwin, witnessed Reyes grab hold of a Correction Officer. (Gwin Dep. Tran. at 11:8-13:4; 20:11-21:5, 21:6-22:3.) He and a second inmate, Joseph Foster, also

witnessed another Officer pull the first Officer out of the way when Reyes lunged at Plaintiff. (Gwin Dep. Tran. at 11:8-13:4, 22:11-24:4, 26:7-27:6; Foster Dep. Tran. 8:18-10:14; 21:17-22:15.)

20.     Plaintiff then went after Reyes and fought him. The inmates went to the ground exchanging blows. Plaintiff punched Reyes in the head and used the rock he carried to hit him on the head with. (See Pl.'s Dep. Tr. 34:16-37:6, 81:12-23, 82:18-25, 87:14—89:22; Alban Decl. ¶ 13; Dapcevic Decl. ¶¶ 11-12; Hess Decl. ¶ 8; Sturtevent Decl. ¶¶ 12-14; Vennero Decl. ¶ 8.)

**Response:**     Disputed. At least one officer never saw any fighting between the two inmates. (Alban Dep. Tran. at 31:19-24.). In any event, Plaintiff, did not "then [go] after" Reyes, he had already been pursuing Reyes and the officers knew that. (Alban Dep. Tran. at 25:17-27:18; Sturtevant Dep. Tran. at 46:24-47:3.) And Reyes attacked Plaintiff after the Officers that had been separating them moved out of the way. (Gwin Dep. Tran. at 11:8-13:4; 22:11-24:4, 30:9-15; Foster Dep. Tran. 8:18-10:14; 21:17-22:15.). Plaintiff defended himself from Reyes because the Officers moved and left. (Pl. Dep. Tran. at 78:13-80:11, 81:12-23.)

21.     Plaintiff carried the rock in his hand the entire time and used it to hit Reyes. (See Pl.'s Dep. Tr. 67:21-23, 73:11-13.)

**Response:**     Undisputed. It is also material that after the inmates separated, Reyes was only found to have "small abrasions" on his head and left knee and lacerations on his left knuckles. (DEFENDANTS 0002, 0061.)

22.     Officer Dapcevic struck Plaintiff with a baton. (Pl.'s Dep. Tr. 90:14—91:7; Dapcevic Decl. ¶ 13.) Officer Dapcevic believed that his use of the baton was justified under the circumstances because Plaintiff was not obeying direct orders to drop the object that he just used to hit Reyes with and get on the ground. (Dapcevic Decl. ¶ 13.) Officers Alban and Sturtevent did not see Officer Dapcevic strike Plaintiff. (Alban Decl. ¶ 15; Sturtevent Decl. ¶ 15.)

**Response:**     Disputed. As a threshold matter, Defendants omitted the material fact of where Officer Dapcevic struck Plaintiff with his baton, which clearly informs whether Officer Dapcevic's use of the baton was justified or reasonable. Officer Dapcevic struck Plaintiff in the head with his baton. (Pl. Dep. Tran. at 29:7-11; 36:20-37:2; 90:14-92:17; 96:14-98:15, 101:2-12, 124:13-125:9, Defs.' Ex. B at DEF PHOTO 4; Gwin Dep. Tran. at 11:8-13:4; 13:16-15:19; 16:4-22; 31:9-32:3; Declaration of Michael Hurley ("Hurley Decl.") at ¶ 8; WC00001-3; WC00005-7,) although he testified it would have been unreasonable to do so, (Dapcevic Dep. Tran. at 106:19-25), and DOCCS Corrections Officers are trained never to strike in the head or neck with a baton and to use as the minimum force required to stop the action they are responding to. (Vennero Dep. Tran. at 12:19-13:13; Sturtevant Dep. Tran. at. 12:13-13:14; Burnett Dep. Tran. at 38:3-8; Hess Dep. Tran at 16:4-17:7; Alban Dep. Tran at 12:23-13:11; Cabral Dep. Tran at 15:21-16:12; Dapcevic Dep. Tran. at 32:5-33:11; 37:8-38:9; 43:11-20; 48:12-49:4.) Even further, Officer Dapcevic has repeatedly reported the reason he struck Plaintiff was that Plaintiff advanced toward him aggressively. (Burnett Dep. Tran. at 30:23-31:15; DEFENDANTS 0061, marked Pl. Ex. 15; Cabral Dep. Tran. at 56:58:16; DEFENDANTS 001, marked Pl. Ex. 3; DEFENDANTS 0075, marked Pl. Ex. 9; Dapcevic Dep. Tran. at 131:13-20, 178:10-25; WC00326-27 at 144:15-145:2.) It is also material and undisputed that Plaintiff did not threaten Officer Dapcevic or any other Officer present. (Pl. Dep. Tran. at 83:14-84:3; Vennero Dep. Tran. at 44:19-45:6; Gwin Dep. Tran. at 28:21-29:4; Foster Dep. Tran. at 27:9-11; Hess Dep. Tran at 49:6-10; Alban Dep. Tran. at 51:24-52:6, 57:9-15, DEFENDANTS 0015, marked Pl's Ex. 16; DEFENDANTS 0033, marked Pl. Ex. 20; Hurley Decl. at ¶ 7; Sturtevant Dep. Tran. at 70:23-71:1.)

23.     Plaintiff testified at his deposition that he and Reyes had been fighting each other on the ground up until Plaintiff was struck with a baton. He testified that they stopped fighting because Plaintiff was struck with the baton. (Pl.'s Dep. Tr. 94:17-22, 105:17-21, 107:22—108:2.)

**Response:**     Disputed. The cited evidence does not support the alleged facts. Plaintiff testified he stopped fighting because Officer Dapcevic struck him in the head with his baton so many times he knew Officer Dapcevic would kill him if he did not move away from inmate Reyes. (Pl. Dep. Tran. at 92:10-94:22; 105:17-106:4; 106:20-24.) Also, material and placing this alleged fact in further dispute is that Officer Dapcevic has claimed Plaintiff separated from Reyes willingly, in compliance with a direct order, and then he struck him, because Plaintiff would not drop the rock. (DEFENDANTS 0061, marked Pl. Ex. 15; DEFENDANTS 0603-605, marked Pl. Ex. 6; Dapcevic Decl. at ¶ 13; Dapcevic Dep. Tran. at 92:19-94:15). He has also reported he and Officers Alban and Sturtevant separated the two inmates, then Plaintiff refused to drop rock, so he struck Plaintiff with his baton. (WC00107, marked Pl. Ex. 14.) Lastly, Officer Dapcevic also reported that neither inmate complied with orders to stop fighting and lay on the ground, so he struck Plaintiff to gain compliance. (DEFENDANTS 0635, marked Pl. Ex. 4; Dapcevic Dep. Tran. at 141:17-142:5; DEFENDANTS 0597-600, marked Pl. Ex. 7; *see also* DEFENDANTS 0021, marked Pl. Ex. 8.) Another officer, Officer Sturtevant, claims Plaintiff and Reyes were fighting; then the pair fell and separated, at which point Sturtevant restrained inmate Reyes; he did not see any use of force. (Sturtevant Decl. at ¶¶ 11-15; Sturtevant Dep. Tran. at. 57:21-58:23, 71:2-5.) Officer Hess claims the pair of inmates were separated, by grabbing Plaintiff off of the other inmate, after they fell. (Hess Dep. Tran at 51:21-25.) Officer Vennero, who was reportedly observing from the roof, testified Plaintiff was removed off of Reyes by two or more officers and placed into handcuffs; he did not see Officer Dapcevic, or any other officers, strike Plaintiff with a baton or otherwise. (Vennero Decl. ¶¶ 4, 9-12.)

24.     The entire incident happened very quickly, at the most, a minute or two. (Pl.'s Dep. Tr. 72:14-22; Hess Decl. ¶ 9; see also Vennero Decl. ¶¶ 8, 10.)

**Response:**     Disputed. Plaintiff's testimony cited does not support the alleged fact. In fact, Plaintiff testified he did not know how long the fight with inmate Reyes was (Pl. Dep. Tran at 83:2-13,) or how

long it took for the response team to arrive to the Yard. (Pl. Dep. Tran. at 110:10-17.) Sturtevant, who was the first to notice Plaintiff, testified the incident lasted approximately three minutes. (Sturtevant Dep. Tran. at 68:6-17.) Davon Gwin testified Plaintiff was following the other inmate, for two to three minutes and Constant and Reyes's fight on the ground was 30 seconds to a minute long. (Gwin Dep. Tran. at 10:24-11:3; 33:21-25.) Foster testified the chase alone persisted for about three to four minutes. (Foster Dep. Tran. at 13:17-25.) The incident, from when the Officers first noticed Plaintiff at 7:45 p.m., to the time he was cuffed at 7:55 p.m., was approximately 10 minutes. (*See* DEFENDANTS 0017, marked Pl. Ex. 11; DEFENDANTS 0635, marked Pl. Ex. 4.)

25.    After Plaintiff was struck with the baton, he laid on the ground and did not resist being placed into handcuffs. (Pl.'s Dep. Tr. 108:6-11; Dapcevic Decl. ¶ 13.)

**Response:**    Undisputed.

26.    Plaintiff was then escorted to the medical clinic by Officer Markwick, who responded to the response called over the radio, and was then transported to a local hospital. (*See* Cabral Decl. ¶ 8; Dapcevic Decl. ¶ 13; Markwick Decl. ¶ 5; Pl.'s Dep. Tr. 118:19—119:5.) Plaintiff was diagnosed with four lacerations to his head/face/ear area with the following descriptions: (1) a 10-centimeter laceration to his right temple, vertical, skull deep (to the bone), open with an approximate ½ centimeter gap, and bleeding profusely; (2) an approximate 3-centimeter superficial cut to his right cheek; (3) an approximate 1-centimeter laceration to the top of his head; and (4) an approximate 6-centimeter laceration to the right ear and back of head, very deep, which bisected the ear. (Use of Force Report – Part B (attached to Collins Decl. at Ex. F); Photos of Plaintiff following the incident (attached to Collins Decl. at Ex. G.) He received approximately 65 sutures to close the lacerations. (Pl.'s Dep. Tr. 121:25—122:7)

**Response:**    Disputed. The cited evidence does not support that any of Plaintiff's lacerations were "skull deep." The remaining alleged facts are undisputed.

27.     DOCCS Directive 4944 (the "Directive") governs the use of physical force whereby physical action is taken by correctional staff to resolve an incident. (Directive 4944 at Parts I-II (attached to Collins Decl. at Ex. H).[1]) Such physical force includes, but is not limited to, the use of batons and firearms. (Id. at Part II.) "Where it is necessary to use physical force, only such degree of force as is reasonably required shall be used." (Id. Part III(B).) Physical force may not be used without prior approval from the Superintendent of the facility "[u]nless there is an immediate danger to safety, security or property." (Id. Part III(D).) Further, physical force may not be used "unless the employee reasonably believes that the physical force to be used is reasonably necessary: for self-defense, to prevent a serious assault or gross destruction of property; to quell a disturbance; or to prevent an escape." (Id. Part III(E).) A baton may be used "only when and to the extent that the employee reasonably believes such use is necessary: for self-defense, to prevent a serious assault or gross destruction of property; to quell a disturbance; or to prevent an escape. (Id. Part III(F).) "Firearms and deadly physical force shall not be used except as a last resort and then only in situations where the employee reasonably believes that deadly force is necessary . . . [t]o defend themselves or a third person from what they reasonably believe to be the unlawful use or immediate danger of unlawful use of the kind of physical force that is readily capable of causing death or other serious physical injury . . . ." (Id. Part III(G)(1).)

**Response:**     Undisputed.

28.     The appropriate amount of force to use in a given situation is subjective and is based on what the officer believes is reasonable and necessary in what may be a "split second" decision. (Burnett Dep. Tr. 36:16-22.) The determination of when to use force and the amount or type of

---

[1] Directive 4944 was designated "Highly Confidential" (attorney's eyes only) during discovery pursuant to the parties' stipulation of confidentiality because it contains information, the disclosure of which could jeopardize institutional safety and security. The document has been redacted for public filing.

force to be used is contingent on the inmate's actions, not on any injuries they may have. (Id. 40:12-19.)

**Response:**   Disputed. The appropriate amount of force to use in a given situation is the bare minimum amount necessary to gain compliance. (Hess Dep. Tran at 16:4-17:7; Dapcevic Dep. Tran. at 32:25-11, 37:25-38:9.)


## PLAINTIFF'S ADDITIONAL MATERIAL FACTS WITH DEFENDANTS' RESPONSE

29.   Each of the Defendant Officers have received training in the use of force and of a baton. (Burnett Dep. Tran. at 33:2-40:11; Dapcevic Dep. Tran. at 40:3-8, 29:3-33:11; 35:19-38:9; Markwick Dep. Tran. at 9:12-18; 10:1-12:17; Vennero Dep. Tran. at 11:24-14:5; Sturtevant Dep. Tran. at 10:2-25, 11:1-13:14; Hess Dep. Tran at 13:22-16:3; Alban Dep. Tran. at 10:11-13:24; Cabral Dep. Tran at 14:6-17, 15:2-11; 15:18-20; DEFENDANTS 2330-2460.)

**RESPONSE:** Undisputed, but disputed to the extent that the statement is wholly material to Defendants' motion for summary judgement. Only Dapcevic used a baton and, to the extent Plaintiff maintains that Hess and Vennero should have used force by firing their weapons into the Yard (or at Plaintiff), Hess and Vennero's use of force training is material only to the extent that they did not fire their weapons.

30.   As per their formal training, DOCCS Corrections Officers are not supposed to strike inmates in the head with batons. (Vennero Dep. Tran. at 12:19-13:13; Sturtevent Dep. Tran. at 12:13-13:14; Burnett Dep. Tran. at 38:3-8; Hess Dep. Tran at 16:4-17:7; Alban Dep. Tran at 12:23-13:11; Cabral Dep. Tran at 15:21-16:12; Dapcevic Dep. Tran. at 32:5-33:11; 37:8-38:9; 43:11-20; 48:12-49:4.)

**RESPONSE:** Disputed. Officers are trained on the DOCCS guidelines governing the use of physical force (Directive 4944), which provided at the time of the May 27, 2013 incident, that

an officer may use force, to wit, a baton, upon an inmate when and to the extent that the officer subjectively believes is necessary for self-defense, to prevent a serious assault or gross destruction of property, to quell a disturbance, or to prevent an escape, and that where the officer determines that such force is necessary, the officer "should take due care to avoid, to the best of their ability in the circumstances, the infliction of serious physical injury." (Directive 4944 at Part III(F); Burnett Dep. Tr. 35:4-10, 37:19—38:2.) The officer's subjective belief as to what force is reasonable and necessary is a split second decision. (Burnett Dep. Tr. 36:16-22.) During training, pursuant to the overall guidelines of Directive 4944's requirement that an officer's use of force be subjectively reasonable and necessary, officers are directed "to try to restrain from hitting above the shoulder area." (Id. at 38:3-8; see also, e.g., Sturtevent Dep. Tr. 12:13—13:7; Hess Dep. Tr. 15:7—17:10; Alban Dep. Tr. 13:12-24 .) Further, the deposition testimony of Defendants cited by Plaintiff does not identify the time periods of the trainings referenced. Moreover, to the extent that individual officers subjectively understood Directive 4944 and their use of force training to mean that they are "not supposed to strike inmates in the head with batons," (Pl.'s Add'l Material ¶ 30), such understanding is not material to Defendants' motion for summary judgment.

31.     At least one officer present during the May 27, 2013 incident thought Plaintiff was not comprehending the officers' directions due to his condition. (WC00423-24 at 241:25-242:17.)

**RESPONSE:** Disputed. The evidence cited does not support the statement that an officer thought Plaintiff was "not comprehending the officers' directions due to [Plaintiff's] condition." (Pl.'s Add'l Material Facts ¶ 31.) If anything, the evidence cited shows Alban's speculation, as a lay witness and without knowledge of Plaintiff's subjective mental state or what Plaintiff was thinking or comprehending at the time, and without medical expertise, that Plaintiff did not obey

the officers' commands because the commands "fell on deaf ears." (WC00424 at 242:6-17.) Moreover, Plaintiff's Paragraph 31 is not material to Defendants' motion for summary judgment.

32.     Plaintiff did not lunge at, advance toward, or threaten any of the officers present immediately before the use of force against him. (Alban Dep. Tran. at 51:24-52:6, 57:9-15, DEFENDANTS 0015, marked Pl's Ex. 16, DEFENDANTS 0033, marked Pl. Ex. 20; Pl. Dep. Tran. at 83:14-84:3; Hess Dep. Tran at 49:6-10; Sturtevent Dep. Tran. at 70:23-71:1; Vennero Dep. Tran. at 44:19-45:6; Gwin Dep. Tran. at 28:21-29:4; Foster Dep. Tran. at 27:9-11; Hurley Decl. at ¶ 7.) And, with the exception of Officer Dapcevic, who committed the use of force, none of the other Officers' affidavits submitted in support of the Defendants' motion for summary judgment against Plaintiff suggest Plaintiff did so. (Dapcevic Decl. at ¶ 13; Alban Decl.; Hess Decl.; Markwick Decl.; Sturtevant Decl.; Vennero Decl.; Cabral Decl.)

**RESPONSE:** Disputed. Plaintiff made a lunging motion toward Sturtevent. (Sturtevent Decl ¶ 12.) Plaintiff was also moving around in every direction, walking toward people and zigzagging. (See, e.g., Dapcevic Dep. Tr. at 120:9-25, 92:24—94:13, 95:9-25, 96:6—97:18.) Additionally, Plaintiff's failure to respond to officers' commands, possession of (at first, an unidentified object and later, of an identified) weapon (the rock), and repeated assault upon another inmate, constituted a threatening situation. (Defs.' 56.1 ¶¶ 11, 13-14; Pl.'s 56.1 ¶¶ 11, 13[2]-14; Alban Decl. ¶¶ 10-13; Dapcevic Decl. ¶¶ 8-13; Sturtevent Decl. ¶¶ 10-13; Vennero Decl. ¶ 9.)

33.     The officers observing from the roof were authorized to use deadly force by firing their weapons when they reasonably believed deadly force was necessary to protect the lives of

---

[2] The documents attached to the Alban Declaration as Exhibit A (photographs of the rock) were previously sent to Plaintiff's counsel. See Individual R. of Practice in Civ. Cases of the Hon. Judge Philip M. Halpern ¶ 4(E)(ii). Notwithstanding, Defendants have provided Exhibit A and produced those documents to counsel again.

those in the Yard. (Hess Decl. ¶ 6; Vennero Decl. ¶ 6.) Neither thought it necessary to apply deadly force by firing their weapons, so they did not do so. (Hess Decl. at ¶ 11; Vennero Decl at 12.)

**RESPONSE:** Undisputed that the Roof Officers were authorized to use deadly force by firing their weapons when they reasonably believed deadly force was necessary to protect the lives of those in the Yard. Undisputed that the Roof Officers did not fire their weapons. Undisputed to the extent that the remainder of the statement is understood to mean that the Roof Officers did not subjectively believe it was necessary to use deadly force under the circumstances they were presented with on May 27, 2013, but disputed to the extent that this portion of the statement is understood to mean that they believed deadly force was not necessary under the circumstances that Plaintiff testified occurred on that date. In any event, the statement not material to Defendants'

34.    Officer Dapcevic struck Plaintiff in the head with his baton. (Pl. Dep. Tran. at 29:7-11; 36:20-37:2, 90:14-92:17; 96:14-98:15, 101:2-12, 124:13-125:9; Defs.' Ex. B at DEF PHOTO 4; Gwin Dep. Tran. at 11:8-13:4; 13:16-15:19; 16:4-22; 31:9-32:3; Declaration of Hurley Decl. at ¶ 8; WC00001-3; WC00005-7.)

**RESPONSE:** Disputed. Dapcevic did not strike Plaintiff in the head with a baton. (Dapcevic Decl. ¶ 14.) Dapcevic struck Plaintiff on Plaintiff's right shoulder area. (Id. ¶ 13.)

35.    Plaintiff was injured and still bleeding when Officer Dapcevic struck him with his baton. (Dapcevic Dep. Tran. at 165:14-22.)

**RESPONSE:** Undisputed but not material to Defendants' motion for summary judgment. Moreover, Plaintiff omits the material facts regarding Plaintiff's actions prior to Dapcevic's use of force. Specifically: that Dapcevic asked Plaintiff if Plaintiff was okay after Dapcevic noticed Plaintiff with blood on his face, but Plaintiff did not answer and, instead, walked toward other inmates, including Reyes, (Dapcevic Decl. ¶¶ 10-11; see Dapcevic Dep. Tr. 82:4-21, 83:13-19);

that Plaintiff then knocked Reyes to the ground and hit Reyes repeatedly in the head with a rock while ignoring officers' direct orders to stop, (Dapcevic Decl. ¶¶ 11-12; see Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶ 21; Dapcevic Dep. Tr. 83:16—84:5, 84:15—92:4); that only after numerous orders to stop fighting were given did Plaintiff then get off of Reyes, (Dapcevic Decl. ¶ 13; see Dapcevic Decl. Tr. 92:10—94:2); that as soon as Plaintiff stood, he moved around in multiple directions, including toward Dapcevic, while continuing to hold the rock/weapon that he had used to hit Reyes with, (Dapcevic Decl. ¶ 13; see Dapcevic Dep. Tr. 92:24—94:13, 95:9-25, 96:6—97:18, 120:9-25); and that Plaintiff continued to ignore multiple orders by Dapcevic to drop the rock/weapon from his hand and to get on the ground, (Dapcevic Decl. ¶ 13; see Dapcevic Dep. Tr. 92:24—94:2 , 95:9-25, 97:10-18, 99:13—100:8, 100:18-20). Additionally, Plaintiff omits the material fact that although Dapcevic saw that Plaintiff had blood on his face, he did not actually observe any cuts or wounds on him. (Dapcevic Dep. Tr. 94:16—95:4.)

36.     No officer observed Officer Dapcevic strike Plaintiff, with his baton or otherwise. (Sturtevent Decl. at ¶ 15; Sturtevant Dep. Tran. at 71:2-5; Alban Decl. at ¶ 15; Alban Dep. Tran. at 40:12-15; Hess Decl. at ¶ 11; Hess Dep. Tran. at 42:2-17, 43:2-4; Markwick Decl. at ¶ 6; Vennero Decl. at ¶ 12; Vennero Dep. Tran. at 35:23-36:22, 44:5-7; Cabral Decl. at ¶ 9; Cabral Dep. Tran. at 21:11-14, 25:19-28:3.)

**RESPONSE:** Undisputed, except that Dapcevic observed his own actions. (Dapcevic Decl. ¶ 13.)

37.     Officer Dapcevic testified that pursuant to his training, it would not have been reasonable to strike Plaintiff in the head with the baton, under the circumstances he was presented with on May 27, 2013. (Dapcevic Dep. Tran. at 106:19-25.)

**RESPONSE:** Undisputed to the extent that the statement is understood to mean that Dapcevic testified that it would not have been reasonable to strike Plaintiff in the head with the baton under the circumstances that Dapcevic testified Dapcevic was presented with on May 27, 2013. Moreover, Dapcevic did not strike Plaintiff in the head with a baton. (Dapcevic Decl. ¶¶ 13-14; see Dapcevic Dep. Tr. 92:24—94:2, 99:2-12, 106:16-18.)

38.     Reyes was not seriously injured after he and Plaintiff were separated. (Sturtevant Dep. Tran. at 63:8-19; Alban Dep. Tran. at 42:12-14.) He had "small abrasions" on his head and left knee and lacerations to his left knuckles. (DEFENDANTS 0002, 0061.)

**RESPONSE:** Disputed to the extent the evidence does not support the statement that Reyes was not "seriously" injured, otherwise undisputed but not material to Defendants' motion for summary judgment.[3]

39.     A baton strike will leave a bruise, especially if one is struck with enough force that they are knocked to the ground. (Vennero Dep. Tran. at 14:9-21; Sturtevant Dep. Tran. at 14:11-25; Bentivegna 7/17/2020 Dep. Tran. at 26:21-27:10; Cabral Dep. Tran at 16:23-17:2; Dapcevic Dep. Tran. at 107:21-108:2.)

**RESPONSE:** Disputed. The cited evidence does not support the statement. Although it is undisputed that a baton strike can cause a bruise, the evidence does not support the statement that it always "will." (Pl.'s Add'l Material Facts ¶ 37; see Vennero Dep. Tr. 14:9-22; Dapcevic Dep. Tr. 107:21—108:2; Sturtevent Dep. Tr. 14:11-25; July 17, 2020 Bentivegna Dep. Tr. 26:21—27:10.) Further, Dapcevic did not strike Plaintiff with a great deal of force and did not knock

---

[3] DEFENDANTS 0061 has been marked "Confidential" pursuant to the parties' so-ordered stipulation of confidentiality and the Court's November 18, 2019 Order (ECF 65). An unredacted version of the instant document and DEFENDANTS 61 will be sent to Chambers but not filed on the public docket.

Plaintiff to the ground. (Dapcevic Dep. Tr. 108:3-5, 100:9-17; Dapcevic Decl. ¶ 13; Defs.' 56.1 ¶ 25; Pl.'s 56.1 ¶ 25; see also Defs.' Resp. to Pl.'s Add'l Material Facts, infra, ¶ 38.)

40. Officer Dapcevic reported he struck Plaintiff in the upper right front shoulder hard enough to cause Plaintiff to fall. (DEFENDANTS 0603, marked Pl. Ex. 6; DEFENDANTS 0597, marked Pl. Ex. 7.)

**RESPONSE:** Disputed. Although it is undisputed that Dapcevic reported that he struck Plaintiff in the upper right front shoulder, (DEFENDANTS 603), Dapcevic did not report that this strike "cause[d] Plaintiff to fall," (Pl.'s Add'l Material Facts ¶ 38 (emphasis added); see DEFENDANTS 603). Plaintiff fell to the ground voluntarily, or laid on the ground, and complied with Dapcevic's orders after Dapcevic used the baton. (Dapcevic Decl. ¶ 13; Defs.' 56.1 ¶ 25; Pl.'s 56.1 ¶ 25; DEFENDANTS 603; Dapcevic Dep. Tr. 100:9-17.)

41. Plaintiff did not sustain any bruising or other injury to his upper right front shoulder. (DEFENDANTS 0603-605, marked Pl. Ex. 6; DEFENDANTS 0606, marked Pl. Ex. 23; Def. Ex. B at DEF PHOTO 11, 12; Lindemann Dep. Tran at 16:17-22, 19:24-22:8, 23:2-24:3, 26:8-11.)

**RESPONSE:** Disputed. The evidence cited consists of, or concerns, medical evaluations completed, and photographs taken, immediately after the May 27, 2013 incident. The evidence shows that, at that time, no such injury was observed or reported, which does not conclusively establish that there was no injury. Further, any absence of injury to the shoulder area supports the conclusion that Dapcevic did not use excessive force or act with malicious intent when striking Plaintiff in that area. (See Dapcevic Decl. ¶ 14; Dapcevic Dep. Tr. 92:24—94:2, 99:2-12, 108:3-5.)

42.      Baton strikes can cause lacerations. (Bentivegna 3/12/2020 Dep. Tran. at 29:2-6;
Bentivegna 7/17/2020 Dep. Tran. at 30:3-6; Dapcevic Dep. Tran. at 49:23-50:23; 107:2-20; Dr.
Duarte's Expert Report.)

**RESPONSE:** Disputed to the extent that Dr. Duarte's Expert Report does not support the
statement because Plaintiff's expert disclosures and report are insufficient to support a finding that
Dr. Duarte is qualified by "knowledge, skill, experience, training, or education" to testify as to the
causation of a scalp laceration, Vale v. United States of Am., 673 F. App'x 114, 116 (2d Cir. 2016)
(summ. order); see Fed. R. Evid. 702, and disputed to the extent that the statement infers that
lacerations of the type sustained by Plaintiff were caused by a baton, but undisputed to the extent
that baton strikes or other blunt force can cause lacerations of a type that Plaintiff did not sustain.
The statement omits the fact that blunt objects would not produce the straight, clean-cut laceration
sustained by Plaintiff which Plaintiff alleges was caused by a baton strike, a laceration which did
not have surrounding swelling or irregular margins and which was just like all of the other
lacerations evidenced in the photographs of Plaintiff that Plaintiff sustained by being slashed with
a sharp, razor-like object. (Dr. Ranade's Expert Rep. at 16; Dr. Mazarin's Expert Rep. at 2-3.)

43.      Plaintiff sustained a laceration on his head where Officer Dapcevic struck him with
the baton. (DEFENDANTS 0603-605, marked Pl. Ex. 6; DEFENDANTS 0606, marked Pl. Ex.
23; Def. Ex. B at DEF PHOTO 3,4; Lindemann Dep. Tran. at 22:9-15, 24:8-24.)

**RESPONSE:** Disputed. All of the lacerations on Plaintiff's head were caused by the
slashing Plaintiff received by another inmate with a sharp, razor like object and there is no medical
evidence that Plaintiff was struck on the head with a baton. (Dr. Mazarin's Expert Rep.; Dr.
Ranade's Expert Rep.; see also Defs.' Resp. to Pl.'s Add'l Material Facts, supra, ¶ 40.)

44.     Plaintiff repeatedly complained of headaches, vertigo, and vision changes and blurry vision, after the May 27, 2013 incident. (Bentivegna 3/12/2020 Dep. Tran. at 20:8-21:7; Bentivegna 7/17/2020 Dep. Tran. at 23:13-24:3, 24:16-25, 25:6-19; Dr. Duarte's Expert Report.)

**RESPONSE:** Undisputed to the extent that the evidence cited indicates that Plaintiff complained of headaches, vertigo, vision changes/blurred vision only while he was incarcerated in the Special Housing Unit after the May 27, 2013 incident, or for one year following that incident, but in any event is not material to Defendants' motion for summary judgment. Further, the statement omits the fact that deep lacerations of the type Plaintiff sustained from a sharp instrument can cause headaches and that Plaintiff's complaints of blurred vision and vertigo could not be medically substantiated. (Dr. Ranade's Expert Rep. at 16; see generally Dr. Ranade's Rep.)

45.     Headaches, vertigo, dizziness, and blurred vision can be caused by a strike to the head. (Bentivegna 3/12/2020 Dep. Tran. at 27:7-28:25; Bentivegna 7/17/2020 Dep. Tran. at 30:7-21).

**RESPONSE:** Undisputed but not material to Defendants' motion for summary judgment. Moreover, there is no evidence that Plaintiff was struck in the head with a baton. (See Dr. Mazarin's Expert Rep.; Dr. Ranade's Expert Rep.; Defs' Resp. to Pl.'s Add'l Material Facts, supra ¶¶ 40-41.)

46.     There was no indication a baton strike to the head was necessary under the circumstances as they existed on during the May 27, 2013 incident. (Burnett Dep. Tran. at 50:21-51:12.)

**RESPONSE:** Disputed. The evidence cited does not support the statement.

47.     Officer Dapcevic was aware that "a[ DOCC] employee may use a weapon other than a firearm (e.g., a baton or a chemical agent) only when and to the extent that the employee

reasonably believes such use is necessary for self-defense to prevent serious assault or gross destruction of property to quell a disturbance or to prevent an escape." (DEFENDANT 2328-2329, marked Pl. Ex. 2 at § 9.2(f); Dapcevic Dep. Tran. at 115:11-22;  DEFENDANTS 2120-2127 at § III (F).)

 **RESPONSE:** Undisputed.[4]

 48. Before Officer Dapcevic struck Plaintiff with his baton, Plaintiff's altercation with inmate Reyes, which Officer Dapcevic regarded as a disturbance, had already ended; Plaintiff was not striking Officer Dapcevic; the nearest inmate was 25 feet away from Plaintiff;  Plaintiff did not strike any other inmates; Plaintiff was not destroying property; and Plaintiff was not attempting to escape. (Dapcevic Dep. Tran. at 117:5-118:7,  118:12-119:16,  119:23-120:19,  121:13-16.)

 **RESPONSE:** Disputed to the extent that the cited evidence does not support the statement that, "[b]efore Officer Dapcevic struck Plaintiff with his baton, . . . Plaintiff was not striking Officer Dapcevic." (Pl.'s Add'l Material Facts ¶ 46.) The evidence states only that "immediately prior" to the point at which Dapcevic struck Plaintiff,  Plaintiff "didn't swing at [Dapcevic] with anything," and that Dapcevic did not "know what [Plaintiff] would have done." (Dapcevic Dep. Tr. 117:5—118:7.)  Disputed to the extent that the cited evidence does not support the statement that Dapcevic regarded Plaintiff's altercation as a "disturbance." (Pl.'s Add'l Material Facts ¶ 46; see Dapcevic Dep. Tr. 117:5—118:7,  118:12—119:16.)  Plaintiff was causing a disturbance. (Dapcevic Dep. Tr. 118:8-11,  118:15—119:22.)  Disputed to the extent the statement infers that before Dapcevic struck Plaintiff, Plaintiff had not struck another inmate.  Plaintiff had struck Reyes multiple times. (Defs.'s 56.1 ¶¶ 20-21; Pl.'s 56.1 ¶¶ 20-21.)  Disputed to the extent the statement

---

[4] DEFENDANTS 2328-2329 has been marked "Highly Confidential" pursuant to the parties' so-ordered stipulation of confidentiality. Defendants have also produced DEFENDANTS 2120-2127 in both a Confidential and Highly Confidential capacity pursuant to the stipulation.

infers that Plaintiff was at all times 25 feet away from any other inmate (other than Reyes). Plaintiff was moving around in every direction, walking toward people, and zigzagging. (Dapcevic Dep. Tr. at 120:9-25.) Undisputed to the extent the fight between Plaintiff and Reyes had ended at the time Dapcevic struck Plaintiff, undisputed to the extent the cited evidence supports the statement's inference that throughout the course of the incident, Dapcevic did not witness Plaintiff actually strike an inmate other than Reyes, and undisputed to the extent Dapcevic did not witness Plaintiff attempt to escape the prison throughout the incident.

Dated: Westchester County, New York
        February 12, 2021

<div style="margin-left:50%">

LETITIA JAMES
Attorney General
State of New York
<u>Attorney for Defendants</u>
By:
 <u>*/s/ Deanna L. Collins*</u>
Deanna L. Collins
Assistant Attorney General
28 Liberty Street
New York, New York 10005
(212) 416- 8906
Deanna.Collins@ag.ny.gov

</div>