```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X
WILLIAM CONSTANT,                              :
                                               :     16-CV-3985 (PMH)
                       Plaintiff,              :
                                               :     DECLARATION OF
       -against-                               :     NEDZAD DAPCEVIC
                                               :
N. DAPCEVIC, et al.,                           :
                                               :
                       Defendants.             :
-------------------------------------------------------X
```

NEDZAD DAPCEVIC, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. I am a defendant in this action and submit this declaration based upon my personal knowledge and a review of documents prepared by New York State Department of Corrections and Community Supervision ("DOCCS") personnel in the ordinary course of business and maintained by DOCCS in the ordinary course of business, in support of defendants' partial motion for summary judgment.

2. I am employed as a Correction Officer ("CO") by DOCCS at Green Haven Correctional Facility ("Green Haven"). I have been employed by DOCCS since on or about January 5, 2005 and have worked at Green Haven since on or about early 2013.

3. I understand Plaintiff filed this lawsuit alleging that I struck him on his head with a baton and that correctional staff failed to protect him from being assaulted by inmates on the evening of May 27, 2013 in the E&F recreation yard. I deny these allegations.

4. On May 27, 2013, I was assigned to supervise inmates in the E&F Yard during the evening recreation period, which generally began around 6:00 pm.

5. There are three officers physically inside the E&F Yard during recreation periods. There are also officers stationed on the roof. On May 27, 2013, CO's Alban, Stutevent, and myself were supervising inside the yard, although I recall that an officer-in-training came into the Yard at the beginning of the recreation period to have a tour of the Yard. He did not stay there and was gone before the incidents relevant to this litigation occurred.

6. E&F Yard is quite large, approximately 100 yards by 100 yards. The E&F Yard has several features, including weight benches, a basketball court, showers, tables, televisions, and phones. On May 27, 2013, there were approximately 300 inmates in the E&F Yard for the evening recreation period.

7. Yard Officers are responsible for ensuring the safety and security of all inmates as well as each other in the Yard. We patrol the Yard in teams to look for suspicious activity throughout the recreation period. Such suspicious activity may include, *inter alia*, drug use, contraband, weapons, violence among inmates and violence against staff. During these rounds, the Yard Officers will constantly stop to observe the different scenarios that are occurring. For example, in areas where a large number of inmates gather, the officers will stop to observe that activity. These observations can take anywhere from a few seconds to several minutes or more, depending on the situation.

8. I first observed Plaintiff in the Yard on May 27, 2013 while CO's Alban, Sturtevent, and myself were near the F&G Corridor door. Plaintiff was approximately 15 feet away and walking toward us from the direction of the basketball court, which is roughly in the middle of the Yard. Plaintiff was bleeding from what appeared to be cuts on his head or face. At that time, I did not know what had happened to him but I later learned that he had been cut by a sharp, razor-like

object by another inmate while he was sitting at a table in the corner of the Yard diagonal from the F&G Corridor door.

9. When I first observed Plaintiff, I also observed that he was holding something about the size of a baseball in his hand. I could not see what the object was because his hand was covering it.

10. I began to approach Plaintiff and asked him if he was okay. Plaintiff did not answer me. I did not walk in a straight line to him because I wanted to be cautious, as I did not know what was going on or what object he was holding and I wanted time to assess the situation while remaining cautious and vigilant of Plaintiff and the other inmates in the area. At this point, I did not know if Plaintiff was coming to us to report an injury or whether he had other intentions. I took a few steps toward my left and approached him in a "hook" fashion.

11. However, something appeared to get Plaintiff's attention at this point and he began to walk fast toward the wall, in the direction of other inmates. He then took the object in his hand and hit Mr. Reyes over the head several times with it.

12. I immediately approached the inmates and yelled to stop fighting numerous times. Plaintiff did not stop attacking Mr. Reyes. Plaintiff knocked Mr. Reyes to the ground and continued to hit him with the object as Mr. Reyes laid on his back.

13. After numerous orders to stop were given, Plaintiff then stood and appeared agitated and angry, and moved around in multiple directions, including toward me. I continued to order him to stop, drop the object (which he still held in his hand), and get on the ground, as I approached. Plaintiff did not do so. Because he was not obeying verbal orders, I used my baton and struck him twice on his right shoulder area and Plaintiff immediately dropped the object. Plaintiff then got on the ground voluntarily and allowed me to place him in mechanical restraints.

Plaintiff was then escorted to the medical clinic by responding officers, who had arrived by that point, per protocol.

14. I did not strike Plaintiff in the head with my baton, nor did I strike Plaintiff with any malicious intent. I did not see Plaintiff get cut with the razor-like object and I had no knowledge that this event was going to occur. I did not know that Plaintiff and Mr. Reyes were going to fight each other. I did not intentionally allow Plaintiff to be assaulted by any inmate and I did not see any other officer do anything to allow Plaintiff to be cut or to fight Mr. Reyes. To the contrary, CO's Alban, Sturtevent, and I did all that we could to get Plaintiff to drop the weapon in his hand and enable us to assist him with any medical need he had at the time. We also did all that we could to stop the inmates from fighting.

15. Accordingly, the claims against me in this lawsuit should be dismissed.

Dated: Westchester County, New York
October 13, 2020

_____
Nedzad Dapcevic